**STATE**

v.

**Isabel TAVERAS.**

**No. 2009–102–C.A.**

Supreme Court of Rhode Island.

March 22, 2012.

**640**

Christopher R. Bush, Department of Attorney General, for State.

Thomas F. Connors, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on November 30, 2011, on appeal by the defendant, Isabel Taveras (defendant or Taveras), from a judgment of conviction on one count of possession of an enumerated quantity of cocaine, for which she received a ten-year suspended sentence, with probation. On appeal, the defendant challenges the denial of her motion to suppress. The defendant alleges that the arresting police officers violated her Fourth Amendment rights when they detained her unlawfully at a traffic stop and conducted a pat-down search without a reasonable articulable suspicion that she might be armed and dangerous. The defendant also alleges that the motion to suppress should have been granted because the officers exceeded the scope of a permissible pat-down search by directing her to unzip and open her jacket. For the reasons set forth in this opinion, we affirm the denial of the defendant's motion to suppress and the judgment of conviction.

## Facts and Travel

On January 10, 2007, at approximately 10:30 p.m., two Providence police officers, Patrolman David Allen (Ptlm. Allen) and Patrolman Louis Gianfrancesco (Ptlm. Gianfrancesco), while on patrol on Laban Street in Providence, observed a conversion van [1] without license plates, with its engine running and its lights on; there was no driver visible to the officers. As the officers drove up to the van with the cruiser's take-down lights [2] illuminated, they observed defendant—who was situated in the front passenger's seat—bend down toward the floor and then stuff something into the left side of her jacket. The officers also confirmed that there was no driver, but they observed that a passenger was seated in the rear of the van. The record discloses that the officers exited the cruiser and approached defendant to inquire why defendant was in the area, what

---

**1.** A conversion van is a larger-style utility van that has been customized with a luxury interior and often provides the rear passengers with greater comforts and amenities, such as entertainment systems. Because such vans are larger in size, the seats and dashboards in conversion vans usually are situated at greater heights than those in regular sized vans.

**2.** Take-down lights are high-powered lights affixed to police cruisers that allow the officers to see better than with standard LED headlights that most vehicles use.

defendant's name was, who owned the vehicle, and where the driver was. Patrolman Allen asked defendant to exit the van. Once a visibly nervous defendant was outside the vehicle, Ptlm. Allen asked her to open her jacket. When she did so, a clear plastic bag, containing a significant amount of what appeared to be crack cocaine, fell to the ground. At that point, the officers seized the plastic bag and placed Taveras in handcuffs.

On May 8, 2007, a criminal information was filed against defendant and Efrain Colon.[3] The defendant was charged with one count of possession of between one ounce and one kilogram of cocaine, and one count of possession with intent to deliver a controlled substance, cocaine. The defendant filed a motion to suppress tangible evidence on the grounds that the search and subsequent seizure were made "without prior judicial approval, without a warrant, without consent, or authority, and without probable cause or articulable suspicion," in violation of article 1, section 6, of the Rhode Island Constitution and the Fourth and Fourteenth Amendments to the United States Constitution. A Superior Court suppression hearing commenced on November 3, 2008. The state presented the testimony of Patrolmen Allen and Gianfrancesco, and Providence Police Officer Andrew Lawton (Officer Lawton); Taveras also testified.

Patrolman Allen testified that on January 10, 2007, at around 10:30 p.m., he was on patrol with Ptlm. Gianfrancesco on La-

ban Street, in the Olneyville section of Providence. Patrolman Allen commented that the area surrounding Laban Street was known as a high-crime area of the city. While on patrol that evening, Ptlm. Allen observed an older Dodge conversion van parked along the street; the vehicle was running, with its lights on. Patrolman Allen first noticed that the van did not have any plates on the front or rear bumpers.[4] The officers proceeded to drive around the block in order to take a second look; they approached from the front and illuminated the police cruiser's take-down lights to confirm that the license plates were, in fact, missing.

With the benefit of the cruiser's lights, Ptlm. Allen testified, he noticed there was no driver present, a female was in the passenger's seat, and there was another individual in the rear seat. The officer testified that the female passenger appeared startled when the spotlights illuminated the van; he added that she immediately "kind of ducked down in her seat and appeared to be reaching towards the floor of the passenger area." Patrolman Allen stated that once she reappeared, he "saw her with her right hand, it appeared she was stuffing something into her [winter] jacket * * * towards her chest, maybe her left arm, and it was on the left side of the jacket." At that point, the officers exited the cruiser and approached the passenger side of the van.

Patrolman Allen testified that he asked Taveras to exit the vehicle because he was

---

**3.** Efrain Colon was the back-seat passenger in the van and was known to defendant as the "uncle" of the driver. A search of Colon revealed a cellophane wrapper containing fifty-four pills of suspected Clonazepam. Colon was charged with one count of possession of a controlled substance, Clonazepam. The record is unclear about what became of Colon's case. The case before this Court pertains only to Taveras.

**4.** Patrolman Allen testified that, after placing the suspects into custody, he returned to the rear of the van where he discovered a temporary tag on one of the rear windows. The temporary tag was not, however, complete because it was missing the VIN number and the issue date.

concerned for his safety based on defendant's suspicious movements, and because her hands were not continuously visible to him. In response to his brief questioning, defendant told the officer that she was on a first date with a fellow named Ricardo and that the van belonged to him. Unfortunately, she could not provide the officers with the name of the man in the back seat—who was dirty and disheveled—or the last name of her date for the evening. The defendant also did not know where the driver was, other than that he had gone into one of the nearby houses. The officer testified that when defendant was answering these questions she appeared very nervous, avoided eye contact with him, and visibly was shaking.

Patrolman Allen testified that he "was concerned for safety reasons because her story didn't seem to add up." He noted that "[t]he gentleman in the back seat was very dirty. He looked like he had been doing manual labor for some time and he just didn't seem to fit the picture of a first date at ten thirty at night." The combination of defendant's story, her nervous demeanor, the fact that it was at night, in a high-crime area, and the fact that Ptlm. Allen saw defendant stuff something into her jacket,[5] prompted him to conduct a *Terry*-type search[6] for weapons. Based on his earlier observation of defendant stuffing something into the left side of her jacket, Ptlm. Allen testified that rather than perform a traditional pat-down search, which would have required him to touch defendant's chest area—

where he saw her stuff something—he asked defendant to unzip her winter jacket. The defendant initially unzipped her jacket but attempted to keep it closed. Patrolman Allen then asked her to pull the jacket back so he could see her left side. When she did so, the officer saw something in a clear plastic bag, which then fell to the ground. The plastic bag appeared to contain a large quantity of crack cocaine. At this point, Ptlm. Allen seized the bag and arrested defendant. He also contacted a female officer to come to the scene to conduct a more thorough search of defendant's person.

Patrolman Gianfrancesco's testimony substantially corroborated that of Ptlm. Allen. He similarly observed defendant make a reaching motion toward the floor of the passenger area and then stuff something into the left side of her jacket. While Ptlm. Allen was questioning defendant, Ptlm. Gianfrancesco focused his attention on the rear-seat passenger, but he nonetheless was able to observe Ptlm. Allen's interaction with defendant. Based on the circumstances at the scene and his observations, Ptlm. Gianfrancesco stated that he suspected defendant might have a weapon under her coat. Patrolman Gianfrancesco also confirmed Ptlm. Allen's account of how the *Terry* search was conducted.

Officer Lawton also testified at the suppression hearing. Officer Lawton testified that he conducted a field test of the suspected crack cocaine; the field test re-

---

**5.** Patrolman Allen testified that, although he observed defendant reach her right hand into the left side of her jacket, he did not see what, if anything, was in her hand.

**6.** *Terry v. Ohio*, 392 U.S. 1, 21, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), instructs that police officers may conduct an investigatory stop and frisk of a suspect provided that the officer has a reasonable suspicion based on

specific and articulable facts that the person to be detained is engaged in criminal activity. The *Terry* Court noted that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868.

vealed that the substance tested positive for cocaine and, when weighed at the Providence Police Department, had a net weight of 50.7 grams and a gross weight of 54.2 grams.

The defendant testified at the suppression hearing—but not at trial. She testified that she knew the driver of the van from around the neighborhood and that she would bump into him a number of times throughout the year. The two arranged to go on a date. The defendant stated that, when her date arrived to pick her up, it was "fairly late; it was probably eleven, twelve o'clock" and that his uncle was in the back seat. The two had planned on going to a movie, and they stopped at a liquor store on the way. Her date brought alcohol back to the car, and he poured her a drink.

According to defendant, the van's next stop was Laban Street, purportedly to pick up a movie (from an unknown person) to watch in the back of the van in case they did not make it to the movie theater on time. The defendant testified that the driver left the vehicle running with the headlights on while he went into a nearby, but unidentified, house to retrieve a movie. As she was waiting for the driver to return, defendant stated that she made small talk with the man in the back seat. While they were chatting, defendant saw a police cruiser drive by slowly. Taveras stated that, after she saw the police cruiser, she "took drugs that were on the console and [she] put them in [her] possession." The defendant admitted that she "felt the best thing to do was take them out of plain view in case [the police] decided to come back" and that she "put them in [her] jacket and * * * zipped it up." She also said that she placed the plastic bag "under [her] left armpit" and not in a coat pocket.

The defendant saw the police cruiser approach the van again, this time head-on, with its headlights illuminated. When the cruiser approached, she stated, she placed the drink she had been consuming down on the floor to her left. She rolled her window down as the officers exited the cruiser and approached the passenger side of the van. The police officer asked what defendant was doing and whether there were any plates on the vehicle, to which defendant responded that there was a temporary license plate in the rear window. She told the officer that the driver was inside one of the residences and that his first name was Ricardo,[7] that she did not know his last name, and that they were on a first date. The defendant also stated that she scoured the front of the van for any paperwork containing the driver's name and information while one officer aimed a flashlight inside the van.

According to Taveras, a third police officer arrived on the scene, opened the driver's side door, and after seeing defendant's cocktail on the floor of the vehicle, repeated the same questions as the other officer. He also asked whether the drink belonged to her, and she admitted that it did. The third officer joined the other officers on the passenger side of the van, where they were searching the uncle. Meanwhile, the driver, Ricardo, materialized and approached the officers. The defendant testified that, as one officer turned to meet Ricardo, Ptlm. Allen opened the passenger door and told defendant to exit the van.

The defendant testified that, once she was outside of the vehicle, Ptlm. Allen put his hands directly into each of her jacket pockets, removing her gloves and keys. The officer then began patting defendant

---

**7.** It was revealed at the suppression hearing that Ricardo Torres was full name of the alleged driver and owner of the van. He did not testify.

down over her clothing, starting with her arms, down to her hips and legs, and all the way to her shoes. Taveras testified that she asked the officer why he was searching her and he did not respond. Next, Ptlm. Allen told defendant to unzip her jacket; when she unzipped the jacket, the officer then asked defendant to spread the jacket open. The defendant testified that Ptlm. Allen then pulled her jacket open even wider, saw a plastic bag, and asked her what it was. The defendant responded by saying, "What do you mean?" and alleges that Ptlm. Allen pulled the bag out of her jacket and said, "Oh, that's a lot of stuff." Patrolman Allen then handcuffed her and told her to wait for a female officer to arrive on the scene.

At the close of the hearing, the state argued that the police officers had the requisite reasonable and articulable suspicion to conduct a *Terry* search of defendant and that Ptlm. Allen did not exceed the scope of the search by asking defendant to open her jacket. The state argued that the totality of the circumstances gave rise to a reasonable and articulable suspicion to conduct a pat-down search; in this case, the circumstances included the fact that the van was in a high-crime area, its engine was running without a driver, the van had no license plates, and defendant did not know much about the people in the vehicle. Moreover, defendant appeared nervous, she visibly was shaking, and she was observed making furtive movements toward the floor of the vehicle and inside her coat.

The defendant conceded that, under *Terry*, the stop and brief investigation were lawful because the vehicle potentially

was unregistered and on a public highway. However, the defense claimed that a *Terry* stop restricts the officer to a pat-down search of an individual's outer clothing, and only if the officer has a reason to believe the person is armed and dangerous. In this instance, defendant argued, the police had no reason to undertake a *Terry*-type frisk. First, defendant contended that based on the height of the van's dashboard, the dark window tinting, and her petite stature, it was not possible for the police to observe defendant place her hand inside her jacket.[8] In addition to her contention that it was physically impossible for the police to see inside the van, defendant argued that after she identified herself, she provided a plausible explanation for her presence and that the police were unable to point to a single inconsistency in the information she provided. Lastly, defendant argued that the officers possessed no evidence that she was involved in criminal activity. Thus, defendant argued that the police had no reason to suspect that she might have a weapon and no right to conduct a pat-down search. The defendant suggested to the trial justice that the only information the police had at the time was that defendant appeared nervous, and that nervousness or furtive movements alone are insufficient and do not rise to the level of a reasonable, articulable suspicion as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

At the close of the hearing, the trial justice denied defendant's motion to suppress. The trial justice recounted the testimony presented at the hearing, and he

---

**8.** We reject defendant's new contention, raised in her supplemental brief, that on remand the trial justice erred by not allowing into evidence a video demonstration of the height of the van, to illustrate that the officers could not have seen defendant place her hand inside her jacket from their vantage point. The case was remanded to the Superior Court for the trial justice to clarify his credibility findings, and not for the purpose of reopening the evidence.

found that the officers had a reasonable basis for conducting the *Terry*-type search of defendant. The trial justice noted that officers must undertake a "layering process * * * in determining whether or not there is suspicion necessary under *Terry* to do a *Terry*-type stop and pat down." The trial justice determined that, based on the facts known to the officer at the scene—that the vehicle lacked plates, it was late at night in a high-crime area, the officers saw Taveras reach down in the van and then stuff something into the left side of her jacket, defendant appeared furtive, and she hardly knew the other parties—a reasonable police officer would be suspicious about what was happening. The trial justice declared that police officers have a right to protect themselves and, in doing so, may go beyond the traditional pat-down search for weapons. The trial justice also noted that a discrepancy existed between what the officers testified to and defendant's testimony, but that "even following the worst scenario, it seems to me that what took place was permissible."

After the trial justice denied defendant's motion to suppress, a jury-waived trial ensued. The state called five witnesses; Taveras did not testify, nor did she call any other witnesses or present any evidence. The testimony elicited largely mimicked that of the suppression hearing. At the close of the state's case, the trial justice, on motion of defendant, dismissed the count charging defendant with possession with intent to deliver narcotics, after finding no evidence to support the charge. After defendant rested, the trial justice found that the state had proven count 2, possession of between one ounce and one kilogram of cocaine, beyond a reasonable doubt. The defendant was sentenced on January 23, 2009, to a suspended term of ten years at the Adult Correctional Institutions, with ten years probation. Judgment of conviction was entered against defendant on February 23, 2009. The defendant timely appealed.

In this Court, the state moved to hold the appeal in abeyance and to remand the case to the Superior Court for clarification by the trial justice of his findings regarding the scope of the search. We granted the motion and remanded the case for further findings, including findings pertaining to the credibility of the witnesses. The trial justice issued a written decision on June 1, 2011, noting that after he heard the testimony and observed the witnesses during the suppression hearing, he "firmly believed the police officers' testimony regarding the incident" and that "[t]he Court at all times found the testimony of the police officers to be accurate and disbelieved that of the [d]efendant." The trial justice further elaborated that "certain facts the [d]efendant testified to essentially corroborated the police officers' testimony, but were often out of context and chronologically incorrect."

A significant detail the trial justice underscored about witness credibility was that "unbeknownst to the police officers at the time they testified regarding their observations of the [d]efendant bending over in the van and then reaching toward the left side of her body, the [d]efendant would also admit that she had indeed made these movements when she testified." The trial justice concluded that the police officers had no way of knowing that defendant would corroborate their testimony about the events that unfolded, and that their credibility, therefore, was enhanced in his view. The trial justice confirmed his prior decision, finding that the police officers were credible witnesses and that they properly seized the cocaine in accordance with *Terry*.

## Standard of Review

"When reviewing a trial justice's denial of a motion to suppress evidence,

this Court affords deference to a trial justice's findings of historical fact and will overturn such findings only if we conclude that the trial justice clearly was wrong." *State v. Parra*, 941 A.2d 799, 803 (R.I. 2007) (citing *State v. Texter*, 923 A.2d 568, 573 (R.I.2007); *State v. Casas*, 900 A.2d 1120, 1129 (R.I.2006)). "We will, however, conduct a *de novo* review of the record and independently consider whether a defendant's rights have been violated." *Id.* (citing *Casas*, 900 A.2d at 1129). "We review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis." *State v. Abdullah*, 730 A.2d 1074, 1076 (R.I.1999) (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. Rios*, 702 A.2d 889, 889–90 (R.I.1997); *State v. Campbell*, 691 A.2d 564, 569 (R.I.1997)).

## Analysis

### I

### Reasonable Suspicion

The defendant ascribes error to the trial justice's finding that the police had reasonable suspicion to ask defendant to open her jacket and that he erred when he denied her motion to suppress the evidence. Although Taveras acknowledges that the initial stop was justified,[9] she argues that the evidence adduced at the hearing demonstrates that the police did not have specific and articulable facts upon which to base a suspicion that she was armed and dangerous.

The defendant, citing *United States v. Thomas*, 863 F.2d 622, 628–29 (9th Cir. 1988), contends that when she was approached by Ptlm. Allen, defendant provided him with a "plausible explanation" for her presence in the vehicle and that the police were unable to point to a single inconsistency in her story. This, defendant contends, should have ended the inquiry. The defendant additionally argues that the police were unable to observe defendant's movements from the cruiser because the height of the van, its dark tinted windows, and defendant's diminutive stature prevented them from doing so. She also asserts that a single furtive movement is not sufficient evidence that a suspect is dangerous. Based on these factors, defendant contends that the police were operating on nothing more than a mere hunch that she was armed and dangerous.

The defendant also intimates that a *Terry* argument is unavailing based on the fact that the officer physically assisted defendant from the van and placed his hands on her—thereby effecting a seizure of defendant. This contention is without merit. Conflicting testimony was provided about how defendant exited the car. Patrolman Allen testified that he merely asked defendant to exit the vehicle; defendant testified that, after Ptlm. Allen asked her to exit the vehicle, he opened the passenger door, and "he grabbed me by my right arm * * * and he kind of nudged me a little bit to get out of the car." The trial justice found the officer's testimony credible. The Supreme Court has held that the additional intrusion of ordering a suspect out of a car during a motor vehicle stop "can only be described as *de minimis.*" *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The

---

**9.** At the suppression hearing, defense counsel conceded that:

"[B]oth police officers had every right in the world, in fact, would have been derelict in their duty if they observed a van that's on a public way, that it's being operated in the sense of the legal definition, the engine is running, the lights are on and it's in a public way. There is no driver and they don't see any plates. The temporary is there, but even forgetting that, they would be derelict in not checking it out."

Court also held that such a request to exit the vehicle is "not a 'serious intrusion upon the sanctity of the person,' [and] it hardly rises to the level of a 'petty indignity.' " *Id.* (quoting *Terry,* 392 U.S. at 17, 88 S.Ct. 1868).

Before this Court, the state contends that Ptlm. Allen acquired sufficient reasonable suspicion to warrant an investigatory stop of the vehicle and to undertake a limited pat-down search of Taveras. The state argues that the trial justice was not clearly wrong in denying defendant's motion to suppress because the totality of the circumstances—the driverless van left running in a high-crime neighborhood, the missing license plates, the officers' observation of defendant reaching down and stuffing something into her jacket, defendant's nervousness, the fact that her story did not add up, coupled with the officers' training and experience—pointed to the conclusion that this experienced police officer had a reasonable and articulable suspicion that defendant may be armed with a weapon.

■ On numerous occasions, this Court has held that "a police officer may conduct an investigatory stop, provided [the officer] has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity." *Abdullah,* 730 A.2d at 1076 (quoting *State v. Halstead,* 414 A.2d 1138, 1147 (R.I.1980)); *see also United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (holding that officers must possess a "particularized and objective basis for suspecting the particular person stopped of criminal activity"); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (indicating that officer's reasonable suspicion of criminal activity must be based on objective facts). If the officer's suspicions are "not dispelled by this stop and accompanying inquiry, he

may perform a limited 'pat-down' search of a suspect's outer clothing for weapons if he has reason to believe the person may be armed and dangerous." *State v. Tavarez,* 572 A.2d 276, 278 (R.I.1990) (citing *Terry,* 392 U.S. 1, 88 S.Ct. 1868).

■ This Court also adheres to the United States Supreme Court's pronouncement in *United States v. Cortez,* 449 U.S. at 417, 101 S.Ct. 690, that, when reviewing the constitutionality of an investigative stop, we must consider the "totality of the circumstances." *See Tavarez,* 572 A.2d at 278 (adopting totality of the circumstances principle in reviewing the constitutionality of an investigative stop); *see also State v. Keohane,* 814 A.2d 327, 330 (R.I.2003) (holding that the reasonableness of an officer's suspicions for an investigatory stop are reviewed in light of the totality of the circumstances). We recognize that numerous factors may arise and coalesce to contribute to an officer's finding of reasonable suspicion of criminal conduct. *See Abdullah,* 730 A.2d at 1077. Although, standing alone, certain factors may not generate the requisite reasonable suspicion, when viewed in their entirety these factors may lead to a reasonable and sustainable suspicion of criminal activity. *Halstead,* 414 A.2d at 1148. This confluence of factors has even greater force when it "involves a pragmatic analysis from the vantage point of a prudent, reasonable police officer in light of the facts known to him [or her] at the time of the detention." *Id.; see Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ("[T]he issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868)); *State v. Collodo,* 661 A.2d 62, 66 (R.I.1995) (noting that the totality of circumstances "must be seen and weighed not in terms of library

analysis by scholars, but as understood by those versed in the field of law enforcement" (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. 690)); *State v. Alamont* 577 A.2d 665, 667 (R.I.1990) (echoing the pronouncement in *Terry* that a search for weapons must be based on whether a reasonably prudent person in the circumstances would be warranted to believe his or her safety or that of others was in danger).

■ As the officers testified, the van was observed idling in what they knew to be a high-crime neighborhood at approximately 10:30 p.m., and without any discernable license plates. The officers also indicated that they both noticed that defendant appeared startled when they turned on the cruiser's spotlight, and saw defendant reach to the floor of the van and then reach into her jacket—which constituted suspicious behavior that defendant admitted in her own testimony. The officers also stated that defendant was nervous and that her story did not add up. *See Collodo,* 661 A.2d at 66 (indicating that furtive gestures paired with nervousness, apparently caused by the presence of police, can increase an officer's level of suspicion). Based on this testimony, we are satisfied that the officers' observations, paired with a pragmatic analysis of the facts known at the time, provided sufficient reasonable suspicion for the officers to suspect defendant of possible criminal conduct and to perform a *Terry*-type frisk for weapons to ensure officer safety.

## II

### Scope of the Search

The defendant also argues that Ptlm. Allen exceeded the scope of a permissible *Terry*-style pat-down when he asked defendant to open her jacket because, she contends, there was insufficient evidence to support a finding that the officers had a reasonable suspicion that she might be armed and dangerous. The defendant suggests that "[e]xploration of what is beneath the clothing by unzipping it also is a search, and a more invasive one; one that requires probable cause." In essence, Taveras argues that Ptlm. Allen was not entitled to search beyond a pat-down of her outer clothing for weapons, and that she had a reasonable expectation of privacy in what was under her outer clothing.

■ The lynchpin of any Fourth Amendment analysis is reasonableness. *See Mimms,* 434 U.S. at 108–09, 98 S.Ct. 330 (quoting *Terry,* 392 U.S. at 19, 88 S.Ct. 1868); *State v. Aubin,* 622 A.2d 444, 445 (R.I.1993). In *State v. Black,* 721 A.2d 826, 830 n. 2 (R.I.1998), we noted that "variable degrees of reasonable suspicion * * * may * * * give rise to a variable scope of authority to search a suspect's person."

> "For example, if an officer observes a suspect making furtive movements towards a particular part of his or her body or clothing as if to hide something there, * * * then the officer has a reasonable basis to conduct a more probing tactile search of this particular area than he or she might otherwise possess absent the prior observance of such activity. This latitude to conduct a more probing patdown search of a specific portion of a suspect's person or clothing, based on a particularized reasonable suspicion to do so, is consistent with the initial purpose of the patdown search— to negate the presence of an obvious weapon that may be hidden there." *Id.* at 830 n. 2.

In *Black,* we also recognized that an officer, "through sight alone, may be able to determine whether an object in plain view is a weapon or not in a shorter span of time and more accurately than it would take to do so in a patdown search." *Id.* at

833. Therefore, an officer may have greater exploratory freedom when conducting a search for a weapon when the officer observes the suspect "making furtive movements towards a particular part of his or her body or clothing as if to hide something there * * *." *Id.* at 830 n. 2.

 Additionally, while a search incident to a *Terry* stop ordinarily is confined to a pat-down of the outer clothing of a suspect, "*Terry* does not in terms limit a weapons search to a so-called 'pat-down' search." *Commonwealth v. Flemming,* 76 Mass.App.Ct. 632, 925 N.E.2d 39, 43 (2010) (quoting *United States v. Hill,* 545 F.2d 1191, 1193 (9th Cir.1976)); *see United States v. Reyes,* 349 F.3d 219, 225 (5th Cir.2003) (finding that the officer did not exceed bounds of permissible *Terry* stop in asking the suspect to empty his pockets and lift his shirt); *United States v. Baker,* 78 F.3d 135, 138 (4th Cir.1996) (concluding that a pat-down frisk is but one example of how a reasonable protective search may be conducted and a request that a suspect lift his shirt is "less intrusive than the pat-down frisk sanctioned in *Terry*"). It is well established that police officers conducting motor vehicle stops confront "inordinate risk," creating concern for officer safety. *Collodo,* 661 A.2d at 66 (quoting *Mimms,* 434 U.S. at 110, 98 S.Ct. 330); *see Long,* 463 U.S. at 1049, 103 S.Ct. 3469 (noting that "protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect"). *Terry* instructs that the purpose of the search is to protect citizens from lawless police conduct while simultaneously ensuring the safety of the public and law enforcement officers. *See Terry,* 392 U.S. at 28–29, 88 S.Ct. 1868.

 We are, however, cognizant that "general searches and seizures that consist 'of a general, exploratory rummaging in a person's belongings' are prohibited under the Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution." *State v. Portes,* 840 A.2d 1131, 1137 (R.I. 2004) (quoting *State v. Pratt,* 641 A.2d 732, 738 (R.I.1994)). A search of a suspect must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. 1868; *see Epps v. State,* 193 Md.App. 687, 1 A.3d 488, 505 (2010) (stating that the "intrusion must be only that which is necessary to detect the presence of a weapon—and nothing more"). As the Supreme Court has noted, "[s]o long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [a] protective purpose." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). In this case, we are of the opinion that this was not a general exploratory search, but was necessary so that the officers might satisfy themselves that defendant had not stashed a weapon inside her jacket. Patrolmen Allen and Gianfrancesco both saw defendant stuff something under the left side of her winter jacket, a fact that defendant admitted; Ptlm. Allen's request that she open her jacket clearly was designed to determine if she was armed with a weapon or other dangerous instrumentality.

 The Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amend-

ment." *Vernonia School District 47J v. Acton,* 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *see Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (stating that the "reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means"). In determining the degree of intrusion, the state's interest in protecting the lives of police officers must be weighed against the intrusion into the suspect's personal liberty. *See Aubin,* 622 A.2d at 445; *Commonwealth v. Bostock,* 450 Mass. 616, 880 N.E.2d 759, 766 (2008) (indicating that officers' intrusions during traffic stops must be proportional to the suspicion that prompted the intrusion). We note that several courts have held that asking a suspect to lift up or open an article of clothing is less intrusive of an individual's personal privacy than a traditional patdown search. *See, e.g., Reyes,* 349 F.3d at 225 (declaring that officer's request that suspect empty pockets and lift shirt was less intrusive than pat-down frisk); *Baker,* 78 F.3d at 138 (holding that officer directing suspect to lift shirt was less intrusive than *Terry* frisk); *Hill,* 545 F.2d at 1193 (finding that, under the circumstances, officer lifting suspect's shirt was not overly intrusive). However, the test is one of reasonableness, *Mimms,* 434 U.S. at 108–09, 98 S.Ct. 330; our task is to determine whether Ptlm. Allen's request was reasonable in light of the facts known to him at the time. We answer this question in the affirmative.

By asking defendant to open her jacket, Ptlm. Allen employed a less-intrusive search than patting down her chest area and reaching under her arms to determine whether that which she was hiding in her jacket was a weapon or other dangerous object. *See Terry,* 392 U.S. at 29–30, 88 S.Ct. 1868 (holding that officer confined

search strictly to what was minimally necessary to establish whether suspects were armed); *Reyes,* 349 F.3d at 225 (holding that officer raising suspect's shirt was less intrusive than a "[n]on-consensual touching of another" and that "[a]t no time during the inspection for weapons did [the officer] touch the defendant"); *Hill,* 545 F.2d at 1193 (finding that officer's request that suspect lift shirt was "wholly confined to the area of the bulge in question and was a direct and specific inquiry," not exceeding bounds of *Terry* ). Here, Ptlm. Allen's request "avoided the 'serious intrusion upon the sanctity of the person' necessitated by the patdown frisk, which requires the officer to 'feel with sensitive fingers every portion of the [suspect's] body.'" *Baker,* 78 F.3d at 138 (quoting *Terry,* 392 U.S. at 17, 17 n. 13, 88 S.Ct. 1868). Moreover, Ptlm. Allen's request was reasonable insofar as it allowed him quickly to confirm or dispel his suspicion that defendant might be armed. *See id.* (officer's request that suspect raise his shirt required little movement by suspect and allowed officer to immediately determine whether suspect was armed without having to come in close contact with him).

 We also are of the opinion that even if Ptlm. Allen was limited to a patdown search of this diminutive female—who was four-foot eleven inches and wearing a winter jacket—and that search failed to reveal tactile proof of a weapon-like bulge, the officer, nonetheless was entitled, under the circumstances of this case, to satisfy himself that she was not secreting a weapon under her coat. The Fourth Amendment does not forbid an officer from taking reasonable measures to protect himself or herself, nor is the officer required to evaluate and elect the least intrusive method while standing along a street, at night, in a high-crime area.

Having carefully reviewed the record before us, we are unable to discern any violation of the defendant's Fourth Amendment rights. Based on the totality of the circumstances, the officers acquired the requisite reasonable suspicion to approach the defendant in the van, and the credible evidence was sufficient to establish that Ptlm. Allen's request to the defendant to open her jacket was reasonable and was a less-intrusive search designed to ensure officer safety.

## Conclusion

For the reasons set forth in this opinion, we affirm the trial justice's denial of the defendant's motion to suppress and the Superior Court's judgment of conviction.

Justice INDEGLIA did not participate.

Justice FLAHERTY, dissenting.

I respectfully dissent from the holding of the majority in this case. I find no fault with the stop and accept the factual findings of the trial justice that justified a frisk of the defendant, pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I depart, however, from the reasoning of the majority with respect to the scope of the police officer's search of the defendant's person.

In *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, the United States Supreme Court first authorized a manual pat-down of persons who an accosting officer believes might be armed and therefore dangerous to the officer. Although it is true that the Supreme Court did not strictly limit the scope or extent of the frisk in that case, the Court nonetheless said:

"where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or oth-

ers' safety, he is entitled for the protection of himself and others in the area to conduct *a carefully limited search of the outer clothing* of such persons in an attempt to discover weapons which might be used to assault him." *Id.* (Emphasis added.)

This Court first addressed the scope of a permissible stop and frisk in the case of *State v. Collodo*, 661 A.2d 62 (R.I.1995). In that case, a police officer who had made a traffic stop became concerned that the driver did not show him a proper driver's license and that his passenger was "fidgeting [and] looking straight forward, looking down" and did not make eye contact with the officer. *Id.* at 63. When he touched the defendant's body, the officer was able to feel a "hard object" which the officer suspected was a weapon. *Id.* At that point, the officer reached into the outer garment of the defendant and removed a loaded gun. *Id.* at 64. In affirming the defendant's conviction, this Court said that the patting down of a person's outer garment is "an 'intrusion upon the sanctity of the person' and thus not to be taken lightly." *Id.* at 66 (quoting *Terry*, 392 U.S. at 17, 88 S.Ct. 1868). The Court nonetheless affirmed the conviction, pointing out:

"our concern for the exposure of an officer to such danger that, we believe, justifies the *de minimis* intrusion incurred in a limited pat-down search for weapons, once the officer has reasonably concluded that the facts available at that moment would 'warrant a man of reasonable caution in the belief' that the pat down was justified." *Id.* (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).

It is certainly true that courts have upheld the actions of law enforcement when police officers, after either seeing a bulge in a defendant's outer clothing, *see, e.g.,*

*United States v. Baker*, 78 F.3d 135, 136, 138 (4th Cir.1996); *United States v. Hill*, 545 F.2d 1191, 1192–93 (9th Cir.1976), or being aware of solid information that a particular defendant is armed and dangerous, *see, e.g., Adams v. Williams*, 407 U.S. 143, 144–45, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *People v. Taggart*, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581, 583 (1967), *appeal dismissed*, 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968), have been permitted to reach into the waistband [10] or other parts of the outer clothing of a defendant to retrieve a weapon. But neither of those factual predicates are present here.

In reasoning that the bounds of *Terry* and its progeny were not exceeded when defendant was asked to open up her coat so that the officer could see what was underneath it, the majority has hitched its wagon to the case of *United States v. Reyes*, 349 F.3d 219 (5th Cir.2003). In that case, the Fifth Circuit held that a Texas border patrol agent did not exceed the permissible bounds of a *Terry* stop when he asked the defendant to raise his shirt. *Id.* at 225. But there, it was significant that the agent had been alerted to the defendant and his cohort by a drug sniffing dog. *Id.* at 222. Knowing that the dog was reacting to the scent of narcotics, based on his experience and training, and

concerned that weapons often accompanied drug transportation at the border, the agent asked the defendant to lift his shirt. *Id.* at 222, 225. After the defendant lifted his shirt, the agent saw a bundle, which proved later to be a controlled substance, taped to the defendant's back. *Id.* at 222.

The Fifth Circuit affirmed the district court's denial of the defendant's motion to suppress. *Reyes*, 349 F.3d at 225. In doing so, the court reiterated the familiar teaching of *Terry*: "[a] law enforcement officer may conduct a limited search of a subject for weapons if he reasonably believes that the suspect may be armed and dangerous." *Id.* at 224 (citing *Terry*, 392 U.S. at 29, 88 S.Ct. 1868). The court also noted that the agent was outnumbered by the two suspects, who were clothed in large jackets that could have concealed a weapon. *Id.* at 225. Finally, the court blessed the manner in which the *Terry* frisk was conducted, reasoning that asking the suspect to lift his shirt was less intrusive than probing his body over his clothing. *Id.*

Whether a pat-down is or is not more intrusive than requiring a citizen to open her coat in the middle of the street, and then openly display what she previously had covered, is open to debate. [11] But what is not open to debate is that with this

---

**10.** However, in *State v. Smith*, 345 Md. 460, 693 A.2d 749, 750 (1997), the Court of Appeals held that an officer exceeded the permissible scope of a protective frisk when he pulled out the shirt of a suspect to view the suspect's waistband and a plastic bag containing cocaine fell out. The court explained that "the objective [of a *Terry* frisk] is to discover weapons readily available to a suspect that may be used against the officer, not to ferret out carefully concealed items that could not be accessed without some difficulty." *Id.* at 751. Most applicable to the case at bar, the *Smith* court explained that police officers were not authorized "to dispense with a pat-down merely because they have reason to

believe that a weapon is concealed at a particular location on a suspect's person." *Id.* at 752.

**11.** As highlighted by the Second Circuit in *United States v. Casado*, 303 F.3d 440, 449 (2d Cir.2002), "*Terry, Sibron* [*v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)], and their progeny teach that the Fourth Amendment protects [the defendant] against an intrusion into his privacy either by a patdown or by an invasion of his clothing, but that the latter is more serious than the former, and that this difference has constitutional significance."

decision the Court plows new ground in our jurisprudence, and in the process lends an elasticity to *Terry* and to our prior holdings beyond a point that I am willing to travel.

Requiring a citizen who is not under arrest to open her coat is a search, plain and simple. There is no dispute that at the time defendant was asked to open her coat there was no probable cause to arrest her and therefore there was no right to search her. *See Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("the Fourth Amendment protects people, not places").

Furthermore, I simply do not agree that the cases cited by the majority, with the limited exception of the Fifth Circuit's holding in *Reyes,* offer any support whatsoever to the Court's conclusion today. The majority cites the Fourth Circuit's holding in *Baker,* 78 F.3d at 138, for the proposition that a pat-down frisk is only one of many alternatives by which a reasonably protective search may be conducted, and as support for the bromide that having the suspect lift his shirt is "less intrusive than the patdown frisk sanctioned in *Terry.*" However, in the *Baker* case, the police officer already had observed a bulge, which he reasonably believed to be a weapon, near the front of the defendant's shirt and in the waistband of his pants. *Id.* at 136. The court said that "[h]aving formed a reasonable belief that [the defendant] was carrying a weapon, Officer Pope had an immediate interest in determining whether [the defendant] actually was armed and, if so, neutralizing any potential threat without assuming unnecessary risks." *Id.* at 138. That is simply not the case here, where the arresting officer

saw nothing that would provide a foundation for a belief that defendant possessed a weapon.

The majority also has cited this Court's holding in *State v. Black,* 721 A.2d 826, 830 n. 2 (R.I.1998), observing that we noted in that case that "variable degrees of reasonable suspicion * * * may * * * give rise to a variable scope of authority to search a suspect's person." However, the *Black* case is inapposite. That case involved the application of the "plain-feel" doctrine first set forth in *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993),[12] and involved a situation in which the police officer already had felt a hard object under the defendant's clothing while conducting a pat-down before probing it further. *Black,* 721 A.2d at 828.

In my opinion, the majority's cite to *Commonwealth v. Flemming,* 76 Mass. App.Ct. 632, 925 N.E.2d 39 (2010) is similarly inappropriate. Although the Court of Appeals did say in *Flemming* that the language in *Terry* does not strictly limit law enforcement to a pat-down search, the court nevertheless vacated the conviction of the defendant who had been convicted of possession of a revolver. *Id.* at 44. In that case, "after observing a bulge at the defendant's waistband, the police lifted the defendant's shirt to ascertain the source of the bulge without first conducting a pat-frisk." *Id.* at 41. In affirming the defendant's motion to suppress, even though the officer had seen the bulge with his own eyes, the court concluded that "though there may be circumstances in which a patfrisk is unnecessary as an initial investigatory step, the present case does not warrant departure from the general rule

---

12. In that case, the Supreme Court explained that "[t]he very premise of *Terry,* after all, is that officers will be able to detect the presence of weapons through the sense of touch

* * *." *Minnesota v. Dickerson,* 508 U.S. 366, 376, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

favoring a patfrisk as a predicate to further investigation in a *Terry* stop." [13] *Id.*

With all due respect, is it my opinion that the majority's citation to *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) is likewise inapt. Although it correctly quotes the Supreme Court that "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive means,'" *id.* at 647–48, 103 S.Ct. 2605, the majority overlooks the fact that *Lafayette* did not involve a *Terry*-type stop at all, but rather an inventory search, conducted at the police station, after a lawful arrest. *Id.* at 641, 103 S.Ct. 2605. *Lafayette* simply bears no relevance to the case before the Court.

Finally, the majority cites *Epps v. Maryland,* 193 Md.App. 687, 1 A.3d 488, 505 (2010), for the proposition "that the intrusion must be only that which is necessary to detect the presence of a weapon—and nothing more." In that case, law enforcement officials had asked a passenger in a motor vehicle to lift his shirt, and when he did, a baggie containing cocaine and marijuana was observed. *Id.* at 491. The Maryland Court of Special Appeals determined that the facts gave rise to a reasonable suspicion to support a *Terry* search, but remanded the case to the trial court to determine whether the defendant had consented to the manner of the search. *Id.* at 494. It was the issue of consent, and not the scope of the search, that was decided by the Maryland court. *Id.* at 493. Indeed, in rendering its opinion, the court said "[w]ere, *arguendo,* the merits of the *Terry* frisk properly before

us, we would hold that directing the appellant to lift his shirt exceeded in scope the *tightly limited intrusion* permitted by *Terry v. Ohio." Id.* at 503 (emphasis added). "The purpose—the only purpose—of a *Terry* frisk is to discover the presence of suspected offensive weapons that could be used to harm the stopping officer. It is most emphatically not to discover the presence of evidence." *Id.* at 504. "Directing the appellant to lift his shirt went beyond the limited scope of a frisk." *Id.*

The very thrust of the majority's opinion in this case is that although the method used by the officers went beyond the scope permitted by *Terry* and most reported cases throughout the country, it nonetheless was permissible because it was both reasonable and less intrusive than a patdown. However, I agree with the reasoning of the Maryland Court of Special Appeals, which said:

> "The suppression hearing judge reasoned, *sua sponte,* that the lifting of the shirt was reasonable because it was less intrusive than a pat-down would have been. The degree of intrusiveness, however, is not the controlling criterion. Nor is the duration of the intrusion. Nor is the degree of embarrassment that the intrusion might cause. The critical limitation is that the intrusion must be only that which is necessary to detect the presence of a weapon—and nothing more." *Epps,* 1 A.3d at 504–05.

I am further concerned that the Court's holding in this case creates a slippery slope that will give rise to a series of flexible and confusing standards for stops and frisks under *Terry.* In my opinion, this presents a particular danger with re-

**13.** The *Flemming* court also noted that a visual inspection of a concealed area may, for Fourth Amendment purposes, be more intrusive than a patfrisk. *Commonwealth v. Flemming,* 76 Mass.App.Ct. 632, 925 N.E.2d 39, 44

n. 10 (2010). The court explained that such an intrusion "may reveal objects (such as soft or pliable items) that would not warrant further investigation, were they felt during a patfrisk." *Id.*

spect to female defendants because the police may maintain, as they did here, that they are reasonably reluctant to frisk women.[14]

For all these reasons, it is my opinion that the officers exceeded the permissible bounds of a *Terry* stop when they required that Ms. Taveras stand in the middle of the street, open up her coat, and reveal what was under it, rather than conduct a pat-down of her outer clothing. In my view, the evidence retrieved as a result of that search should have been suppressed.

---

**14.** In an exquisite footnote, the *Epps* court said:

"Would lifting her shift, for instance, also have been less intrusive to a female stoppee? Is that, moreover, a question for the judge or for the frisking officer to decide on behalf of the stoppee? If a female stoppee were directed to empty her pockets on the assumption that that would be less intrusive (embarrassing to her) than to be closely patted down by a male stopping officer, and out of her pockets came pouring narcotics, would the narcotics be admissible as the product of a properly limited *Terry* frisk? What price gallantry? She was saved embarrassment, but she's now doing 25 years." *Epps v. Maryland,* 193 Md.App. 687, 1 A.3d 488, 504–05 n. 2 (2010).