July 27, 2023

**Supreme Court**

(Dissent begins on Page 33)

| | | |
|---|---|---|
| State | : | |
| v. | : | No. 2021-153-C.A. (K2/19-513A) |
| Junjie Li. | : | |
| | | |
| State | : | |
| v. | : | No. 2021-154-C.A. (K2/19-513B) |
| Zhong Kuang. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| State | : | |
| v. | : | No. 2021-153-C.A. (K2/19-513A) |
| Junjie Li. | : | |
| | | |
| State | : | |
| v. | : | No. 2021-154-C.A. (K2/19-513B) |
| Zhong Kuang. | : | |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.** In these cases consolidated for argument, the state appeals from two identical orders of the Superior Court granting the defendants', Junjie Li (Li) and Zhong Kuang (Kuang) (collectively, defendants), motions to suppress evidence of approximately ninety-four (94) pounds of marijuana seized from Kuang's vehicle during a traffic stop.[1] On appeal, the state asserts that the trial justice erred in granting the defendants' motions to suppress, contending

---

[1] On September 5, 2019, Li and Kuang each filed separate motions to suppress seeking the same relief—suppression of the ninety-four pounds of marijuana. As a result, these motions were heard and decided together by the Superior Court. On February 15, 2023, Kuang filed a motion to join in the appellate brief of Li, which we granted on March 24, 2023.

that the police officer who conducted the traffic stop had reasonable suspicion to prolong the stop after detecting a slight odor of marijuana and observing nervous behavior on the part of the defendants. For the reasons set forth herein, we vacate the orders of the Superior Court.

**Facts and Travel**

The facts of this case arise from events that occurred on May 25, 2019. On that day, Rhode Island State Trooper Justin Andreozzi (Officer Andreozzi) was assigned to monitor northbound traffic on Interstate 95 from a fixed position located in the median under the Austin Farm Road overpass in the Town of Exeter.[2] At approximately 11:16 a.m., Officer Andreozzi observed a black Ford Taurus sedan with a New York registration traveling northbound in the right traffic lane. As the vehicle approached Officer Andreozzi's post, he observed that the front-seat passenger, who was later identified as Kuang, was sleeping and not wearing his seat belt.[3] Because of this, Officer Andreozzi entered the highway and attempted to

---

[2] Officer Andreozzi graduated from the Rhode Island State Police Academy in 2011 and had been a State Trooper for approximately ten years at the time of the hearing. Before becoming a State Trooper, Officer Andreozzi was a police officer for the Town of Portsmouth for approximately four years. Officer Andreozzi testified that, during his time in the police academy, he received training on how to detect marijuana and other drugs through sight and smell, as well as on how to detect nervous behavior and how that behavior corresponds to potential criminal offenses involved in motor vehicle stops.

[3] At the February 24, 2021 hearing, counsel for defendants stipulated to Li's and Kuang's identification.

catch up with the vehicle for the purpose of conducting a traffic stop related to the seat-belt violation. According to Officer Andreozzi, once he was behind the vehicle, he observed Kuang looking over his left shoulder at the cruiser and then put his seat belt on.[4] Thereafter, Officer Andreozzi activated his emergency lights in the area of Weaver Hill, and the vehicle came to a slow stop in the breakdown lane.

Once the vehicle was pulled over, Officer Andreozzi exited his police cruiser and approached on the passenger side to avoid standing directly in the road. As Officer Andreozzi approached the vehicle, he observed two male occupants—Li, who was operating the vehicle, and Kuang, who was in the passenger seat. Officer Andreozzi initiated the traffic stop by speaking with Li and explaining the reason for the stop.[5] Officer Andreozzi thereafter asked Li for his license, registration, and insurance, which he provided. Officer Andreozzi noticed that the name on the vehicle's registration was different from the driver's name, and Li explained that the

---

[4] Officer Andreozzi testified that, when the vehicle initially passed his location, it was clear that Kuang was asleep. It was only after Officer Andreozzi got behind the vehicle that he observed Kuang sit up, look back at him, and put his seatbelt on. According to Officer Andreozzi, when he approached the vehicle after pulling it over, it appeared that Kuang was sleeping again until Officer Andreozzi made contact with defendants, at which point Kuang woke up.

[5] Although it was apparent to Officer Andreozzi that English was not Li's primary language, Officer Andreozzi did not believe that there was any significant language barrier as Li appeared to understand what Officer Andreozzi was asking and provided proper responses. We believe, as did the Superior Court, that it is necessary to note that both defendants requested and were provided with a court interpreter for the hearing on their motions to suppress.

vehicle belonged to Kuang, Li's uncle, and that he and Kuang were going to visit a friend in Chinatown in Boston for a couple of hours and would be driving back to New York thereafter. Li also explained that the reason he was driving Kuang's vehicle was that Kuang was tired due to the long ride from New York to Boston.

While conversing with Li, Officer Andreozzi stated that he noticed Li begin to exhibit nervous behavior. Specifically, Officer Andreozzi stated that he observed Li's neck pulsing, his chest pounding, and his beginning to perspire despite the mild temperature in late May. Officer Andreozzi stated that he could see Kuang's chest was pounding as well. It was around this time that Officer Andreozzi also detected a "slight odor of fresh marijuana" coming from inside the vehicle.

Subsequently, once Officer Andreozzi obtained defendants' driver's licenses and the vehicle's registration, he requested that Li exit the vehicle and directed him to sit in the front passenger seat of the police cruiser while Officer Andreozzi performed law enforcement checks. According to Officer Andreozzi, he requested that Li exit the vehicle for his safety, to separate Li and Kuang, and to ask questions without prolonging the stop. Notably, Officer Andreozzi testified that Li was not free to leave once he was placed in the front passenger seat of the police cruiser. Officer Andreozzi then returned to his cruiser to conduct the law enforcement check, and, in conducting this check, he learned that the vehicle's registration was active,

- 4 -

that both defendants had valid New York driver's licenses, and that neither had any criminal history.

While Li was sitting in the cruiser, Officer Andreozzi proceeded to ask him several questions. Specifically, Officer Andreozzi asked Li questions concerning whether the vehicle contained any illegal contraband such as firearms, cocaine, or methamphetamines, to which Li replied no. Officer Andreozzi then asked Li if the vehicle contained any marijuana.[6] According to Officer Andreozzi, Li paused and did what Officer Andreozzi described as a "target glance" at the vehicle before stating that the vehicle did not contain marijuana.[7] Officer Andreozzi explained that a target glance is a nonverbal indicator of criminal activity, specifically the transportation of narcotics. It was around this time that Officer Andreozzi called for backup and requested that Rhode Island State Trooper James D'Angelo (Officer D'Angelo) report to the scene with his K-9, Chuck, who was trained in marijuana detection.

---

[6] According to Officer Andreozzi, asking individual questions concerning different types of narcotics and contraband is a tactic used by officers when they suspect some type of criminal activity is afoot. This tactic allows officers to gauge how the suspect's verbal and nonverbal responses change based on the narcotic or contraband referred to in the question.

[7] Officer Andreozzi also stated that, while he was questioning Li about the presence of marijuana in the vehicle, Li initially told Officer Andreozzi that he did not know what marijuana was before stating that there was no marijuana in the vehicle.

Shortly thereafter, Officer D'Angelo arrived at the scene with Chuck. Officer Andreozzi had Li remain in the front passenger seat of his police cruiser, and he requested that Kuang, who was still sitting in the passenger seat, exit the vehicle and stand in front of the cruiser in the breakdown lane. As Kuang exited the vehicle, Officer Andreozzi stated that he again detected an odor of fresh marijuana, this time emanating from Kuang's clothing. Once Kuang exited the vehicle, Officer D'Angelo brought Chuck to the front of the vehicle to perform an exterior sniff of the vehicle. Officer D'Angelo guided Chuck to the front passenger headlight and then walked him counterclockwise around the vehicle. Once Chuck reached the rear of the vehicle, he placed his nose on the trunk seal and sat down, indicating to Officer D'Angelo the presence of a narcotic odor. The length of time between the initial stop and the dog sniff was approximately fifteen minutes.

Officer Andreozzi then proceeded to open the trunk of the vehicle, where he and Officer D'Angelo observed five large laundry-style bags containing a total of ninety-four (94) approximately one-pound vacuum-sealed bags of suspected marijuana. Thereafter, Officer Andreozzi and Officer D'Angelo placed Li and Kuang under arrest and transported them to the Hope Valley Barracks. Officer Andreozzi then arranged for the vehicle to be towed to the Hope Valley Barracks.

After the vehicle arrived at the barracks, Officer Andreozzi and Officer D'Angelo performed an inventory search and discovered a set of metal nunchucks

in the map pocket of the driver's-side door. Officer Andreozzi and Officer D'Angelo also removed the suspected marijuana from the trunk of the vehicle and conducted a field test. The test yielded a positive response to the presumptive presence of marijuana. Officer Andreozzi and Officer D'Angelo further discovered approximately $6,100 in Kuang's wallet while searching his person. The state ultimately charged both Li and Kuang with one count of possession with intent to deliver marijuana and one count of possession of one to five kilograms of marijuana. The state also separately charged Li with possession of the metal nunchucks in violation of G.L. § 1956 11-47-42.

On September 5, 2019, Li and Kuang moved, individually, to suppress the marijuana seized from Kuang's vehicle. A suppression hearing was held on February 24, 2021, and on May 10, 2021, the trial justice issued a written decision, granting both motions to suppress. In granting the motions, the trial justice first explained that removing Li from the vehicle was a deviation from the mission of the traffic stop, and thus, Officer Andreozzi prolonged the stop when he removed Li from the vehicle. To this point, the trial justice reasoned that, although officers are generally permitted to ask a driver to exit the vehicle during a motor vehicle stop for purposes of officer safety, Officer Andreozzi's actions were "more akin to using officer safety as a mechanism to facilitate a detour from the traffic enforcement mission." The trial justice opined that Officer Andreozzi's conduct during the traffic

stop was "at odds with [that of] someone who ha[d] legitimate concerns for their safety."[8] The trial justice was also not persuaded by Officer Andreozzi's two additional justifications for removing Li from the vehicle: to separate Li and Kuang and to prevent prolonging the traffic stop. For these reasons, according to the trial justice, it was clear that Officer Andreozzi departed from his seat-belt-violation mission and pursued a narcotics investigation when he removed Li from the vehicle.

After concluding that Officer Andreozzi prolonged the traffic stop when he removed Li from the vehicle, the court then proceeded to address the reasonableness of Officer Andreozzi's prolonging the stop. Importantly, the trial justice declined to consider Officer Andreozzi's observations of Li's behavior after Li was removed from the vehicle because, for the reasons noted above, these events occurred after the stop was prolonged. The trial justice concluded that the nervousness of defendants, as well as their route of travel, was of minimal relevance, and that "nervousness, coupled with the *slight* odor of marijuana and the location of the traffic stop being in a known drug trafficking corridor" was insufficient to establish reasonable suspicion to prolong the stop. In reaching this conclusion, the trial justice noted that Officer Andreozzi did not follow up on the slight odor he detected by asking, for example, whether defendants had a medical marijuana card or if either

---

[8] To this point, the trial justice noted that "[w]hat [was] most concerning * * * is that Andreozzi did not conduct a pat down of Li, which [was] inconsistent with his statement that he asked Li to exit the vehicle out of a concern for his safety."

Li or Kuang had been smoking marijuana that day. According to the trial justice, asking these questions would have allowed Officer Andreozzi to better develop his suspicions during the stop. However, Officer Andreozzi did not do this, and, consequently, the trial justice was of the opinion that the extension of the traffic stop beyond its original scope was unreasonable under the circumstances because Officer Andreozzi did not have independent reasonable suspicion to prolong the stop. Therefore, the trial justice granted both motions to suppress.

An order granting Li's motion to suppress was entered on May 21, 2021, and the state filed a timely notice of appeal.[9]

**Standard of Review**

"When reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice." *State v. Morillo*, 285 A.3d 995, 1002-03 (R.I. 2022) (brackets omitted) (quoting *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010)). "This Court 'will not overturn a trial justice's factual findings unless they are clearly erroneous.'" *Id*. at 1003 (quoting *State v. Gonzalez*, 254 A.3d 813, 817 (R.I. 2021)). "A finding is clearly erroneous when, although

---

[9] Although the state filed notices of appeal in both cases on May 28, 2021, the order granting Kuang's motion to suppress was not entered until January 5, 2022. Nevertheless, we treat this appeal as timely. *See* Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure ("A notice of appeal filed after the announcement of a decision, sentence, or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof.").

there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. (quoting *State v. Grayhurst*, 852 A.2d 491, 513 (R.I. 2004)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review." *Id*. (brackets omitted) (quoting *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011)). "We review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis." *State v. Taveras*, 39 A.3d 638, 646 (R.I. 2012) (quoting *State v. Abdullah*, 730 A.2d 1074, 1076 (R.I. 1999)).

**Discussion**

The state contends on appeal that the trial justice incorrectly concluded that the vehicle stop in this case was prolonged without reasonable suspicion of criminal activity. According to the state, Officer Andreozzi's experience and training, coupled with defendants' nervousness, Li's responses to questions, and Officer Andreozzi's detection of the slight odor of fresh marijuana, constitute specific and articulable facts giving Officer Andreozzi reasonable suspicion to prolong the traffic stop for purposes of conducting a dog sniff of the vehicle. Therefore, the state maintains, the trial justice erred in granting defendants' motions to suppress.

Conversely, defendants contend that the trial justice properly granted their motions to suppress, arguing that Officer Andreozzi unlawfully prolonged the traffic

- 10 -

stop because he did not possess reasonable suspicion to inquire about crimes other than the seat-belt violation. According to defendants, the slight odor of marijuana, combined with defendants' nervousness, did not give Officer Andreozzi reasonable suspicion to believe that criminal activity was afoot. As such, defendants ask this Court to affirm the trial justice's grant of their motions to suppress.

"The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a person's right to be secure against unreasonable searches and seizures." *State v. Foster*, 842 A.2d 1047, 1050 (R.I. 2004). "A traffic stop, by definition, embodies a detention of the vehicle and its occupants. It therefore constitutes a seizure within the purview of the Fourth Amendment." *United States v. Chhien*, 266 F.3d 1, 5 (1st Cir. 2001); *see also State v. Parra*, 941 A.2d 799, 803-04 (R.I. 2007) ("It is well established that when a police officer makes a traffic stop, both the driver and any passengers are seized within the meaning of the Fourth Amendment, regardless of the brevity of the stop."). Thus, any occupant in the vehicle "may challenge his own detention regardless of whether he was the immediate target of the investigation or whether he had a privacy interest in the vehicle itself." *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998).

"It is well established that a traffic stop, regardless of how brief and limited, constitutes a seizure for Fourth Amendment purposes, and thus must be reasonable under the circumstances." *State v. Quinlan*, 921 A.2d 96, 106 (R.I. 2007); *id*. at 108

("An automobile stop and subsequent investigation must be reasonable under the circumstances, including its purpose and duration."). The United States Supreme Court has made clear that, in order to justify the type of seizure involved in a traffic stop, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). While a mere "hunch" does not create reasonable suspicion, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause * * *." *Id*. (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Put simply, reasonable suspicion "takes into account 'the totality of the circumstances—the whole picture.'" *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

At the outset, we note that counsel for defendants conceded at the February 24, 2021 suppression hearing that the initial stop by Officer Andreozzi was valid, and that after Chuck indicated to Officer D'Angelo the presence of a narcotic odor, the troopers had probable cause pursuant to the automobile exception to search the

- 12 -

vehicle. *See United States v. Orth*, 873 F.3d 349, 353-54 (1st Cir. 2017) (holding that in determining the lawfulness of a traffic stop, the court must first consider "whether the initial stop was justified; and second, whether the police had a legal basis to justify an investigation beyond the scope of the reason for the stop itself"). Therefore, the primary question presented by the instant appeal is whether Officer Andreozzi possessed reasonable suspicion to believe criminal activity was afoot, justifying the prolongation of the stop to conduct a dog sniff.

As mentioned above, the trial justice determined in this case that Officer Andreozzi "departed from his seatbelt violation mission and pursued a narcotics investigation when he removed Li from the vehicle." Specifically, the trial justice concluded that "Andreozzi removed Li from the vehicle under the pretense of a safety precaution in order to facilitate a detour from the traffic violation mission of the traffic stop and to perform [an] on-scene investigation into narcotic trafficking." In making this determination, the trial justice explained that he was not persuaded by Officer Andreozzi's testimony that he removed Li from the vehicle for his safety while conducting ordinary inquiries incident to the traffic stop because Officer Andreozzi's actions were "more akin to using officer safety as a mechanism to facilitate a detour from the traffic enforcement mission." The trial justice further explained that Officer Andreozzi "feeling uncomfortable" did not equate to "feeling unsafe" because doing so "would set a significantly lower standard than the one

expressed in [*Pennsylvania v.*] *Mimms*[, 434 U.S. 106 (1977),] and *Rodriguez* [*v. United States*, 575 U.S. 348 (2015),] for police officers to remove drivers and passengers from their vehicles." Based on these reasons, the trial justice found that Officer Andreozzi prolonged the traffic stop when he removed Li from the vehicle and did so under the pretense of officer safety.

On appeal, the state argues that Officer Andreozzi's request for Li to step out of the lawfully stopped vehicle was constitutionally valid and did not unnecessarily prolong the traffic stop. According to the state, the trial justice misconstrued the holdings set forth in *Mimms* and its progeny, and ignored this Court's settled jurisprudence in determining that Officer Andreozzi departed from the seat-belt-violation mission when he asked Li to exit the vehicle. To this point, the state relies on *State v. Collodo*, 661 A.2d 62 (R.I. 1995), where this Court held that, under *Mimms*, an officer may, as a matter of course, order a driver to step out of a lawfully stopped vehicle. *See Collodo*, 661 A.2d at 64. Therefore, the state maintains, it was not necessary, as a matter of law, for Officer Andreozzi to have an articulable fear for his safety before asking Li to exit the lawfully stopped vehicle. Nevertheless, according to the state, the record reflects that Officer Andreozzi had not one but three valid law enforcement reasons for asking Li to step out of the vehicle. Consequently, the state contends, Officer Andreozzi's request for Li to step

out of the vehicle was "constitutionally valid and wholly comports with this Court's jurisprudence."[10]  We agree.

The United States Supreme Court has made clear "that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*.  Put simply, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop * * * do[es] not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop * * * and attend to related safety concerns * * *." *Rodriguez*, 575 U.S. at 354.  Thus, "[a]uthority for the seizure * * * ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.  However,

---

[10] Notably, defendants did not respond to these arguments made by the state relative to the issue of when the traffic stop was prolonged in their submissions to this Court.  At oral argument, however, counsel for defendants argued that the stop was prolonged once Li was physically placed inside the cruiser.

this does not mean that the mission of an officer conducting a traffic stop is constrained to determining whether to issue a traffic ticket. *See id*. at 354-55. As the Supreme Court noted in *Rodriguez*, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop.'" *Id*. at 355 (brackets omitted) (quoting *Caballes*, 543 U.S. at 408). "Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But * * * he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*.

"It is well settled that an officer can order the driver and passengers to get out of a lawfully stopped vehicle without violating the Fourth Amendment's prohibition against unreasonable searches and seizures." *Quinlan*, 921 A.2d at 108; *see also Mimms*, 434 U.S. at 111 n.6 (holding that police officers may order the driver out of a lawfully stopped vehicle); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending the holding set forth in *Mimms* to apply to passengers of lawfully stopped vehicles). In *Mimms*, the United States Supreme Court held that police officers can order the operator of a car stopped for a traffic offense to get out of the

- 16 -

vehicle. *Mimms*, 434 U.S. at 111 n.6.  In so holding, the Supreme Court explained that:

> "We think this additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a serious intrusion upon the sanctity of the person, but it hardly rises to the level of a petty indignity. * * * What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id*. at 111 (internal quotation marks omitted).

As noted by the state, in *Collodo*, we had opportunity to consider whether the Supreme Court's holding in *Mimms* required an officer to have a reasonable belief or a valid reason to suspect that a person is armed and dangerous before ordering a person out of a lawfully stopped vehicle. *Collodo*, 661 A.2d at 64.  In determining that *Mimms* did not impose any such requirement, we explained that "[n]owhere in the *Mimms* opinion did the Supreme Court suggest a requirement that the police officer have a reasonable belief that the defendant was armed and dangerous." *Id*. We therefore expressly rejected the proposition that *Mimms* required an officer to have a reasonable belief or a valid reason to suspect that a person is armed and dangerous before the officer may order the person out of the car. *Id*.  Thus, relying on *Mimms*, we held that "an officer may, as a matter of course, order a driver to step

- 17 -

out of a lawfully stopped vehicle." *Id.*; *see also State v. Soares*, 648 A.2d 804, 806 (R.I. 1994) (holding that "the reasoning in *Mimms* should be extended to apply to any occupants of vehicles stopped for any valid reason").

In the instant case, it is clear that, applying the holdings set forth in *Mimms* and *Collodo*, Officer Andreozzi was permitted, as a matter of course, to order Li to step out of the lawfully stopped vehicle. *See Mimms*, 434 U.S. at 111 n.6; *Collodo*, 661 A.2d at 64. In fact, while Officer Andreozzi provided three justifications for asking Li to step out of the vehicle, all of which the trial justice found to be unpersuasive, these rationales were unnecessary for Officer Andreozzi to establish before ordering Li out of the vehicle. *See Collodo*, 661 A.2d at 64. Officer Andreozzi's request for Li to exit the lawfully stopped vehicle was in no way unconstitutional, as it was a *de minimis* intrusion on his personal liberty. *See Mimms*, 434 U.S. at 111 (holding that the insistence by law enforcement to have a motorist stand along roadside is not a "serious intrusion upon the sanctity of the person[]" and "hardly rises to the level of a 'petty indignity'") (quoting *Terry v. Ohio*, 392 U.S. 1, 17 (1968)). We therefore disagree with the trial justice that Officer Andreozzi prolonged the stop and departed from the seat-belt-violation mission when he removed Li from the vehicle. However, because we are of the opinion that reasonable suspicion did exist at this time, as examined below, we need not pinpoint the exact moment when the stop was prolonged.

In considering whether Officer Andreozzi possessed reasonable suspicion to prolong the stop, the trial justice opined that there were few facts, when viewed together, that could provide Officer Andreozzi with reasonable suspicion to believe criminal activity was afoot. According to the trial justice, the only articulable facts available to Officer Andreozzi at the time he prolonged the stop were "Li's nervousness, the slight odor of marijuana, and the fact that [d]efendants were traveling on a public highway known to be part of a drug trafficking corridor."

With respect to nervousness, the trial justice stated that nervousness was of slight use because it "is a common and entirely natural reaction to police presence." (Quoting *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005).) Similarly, the trial justice stated that the fact that defendants were traveling on a public highway considered to be part of a drug trafficking corridor was of minimal probative value because it would be unreasonable to infer that a person is a drug trafficker simply from using a highway. Lastly, as to the slight odor of marijuana, the trial justice explained that, although this Court has not yet "addressed how the odor of marijuana affects the reasonable suspicion or probable cause determination in light of the decriminalization of marijuana," marijuana remains a factor to be considered because it is still contraband despite being decriminalized. However, the trial justice also stated that the court cannot ignore the effect the decriminalization of marijuana has on motor vehicle stops. According to the trial justice, were the court to hold that

- 19 -

the odor of marijuana, combined with nervousness and a vehicle's route of travel, with nothing more, provides reasonable suspicion, "it would be undermining our Fourth Amendment jurisprudence that serves to protect the right of the people to be free from unreasonable searches and seizures."

For these reasons, the trial justice concluded that the factors which he detailed were "insufficient to establish reasonable suspicion to prolong the traffic stop of [Kuang's] vehicle." The trial justice therefore held that Officer Andreozzi's extension of the traffic stop beyond its original scope was unreasonable under the circumstances because he did not have independent reasonable suspicion to prolong the stop of the vehicle.

As the trial justice noted, this Court has yet to address how the odor of marijuana affects the reasonable-suspicion or probable-cause determination in light of the decriminalization, and subsequent legalization, of marijuana in Rhode Island.[11] On this point, defendants suggest that Officer Andreozzi could detain Li for an investigation into drug offenses only if he possessed reasonable suspicion to believe the vehicle contained more than one ounce of marijuana. According to defendants, this is because possessing less than one ounce of marijuana was

---

[11] At the time of the stop and of the trial justice's decision, marijuana in Rhode Island was decriminalized but not yet legalized. *See* G.L. 1956 § 21-28-4.01(c)(2). On May 25, 2022, the General Assembly enacted the Rhode Island Cannabis Act, which authorizes individuals to possess one ounce of marijuana for recreational use. *See* G.L. 1956 § 21-28.11-22(a)(1).

decriminalized by the Rhode Island Controlled Substances Act, and later legalized by the Rhode Island Cannabis Act. *See* G.L. 1956 § 21-28-4.01(c)(2)(iii), as amended by P.L. 2012, ch. 221, § 1 and P.L. 2012, ch. 233, § 1;[12] G.L. 1956 § 21-28.11-22(a)(1). Therefore, defendants contend that police may not rely upon the odor of marijuana, with no other facts indicating quantity, to establish reasonable suspicion to prolong a traffic stop. Consequently, defendants aver, reasonable suspicion that a criminal amount of marijuana is in the vehicle, supported by articulable facts, is necessary to detain the occupants for an investigation.

However, the state maintains that the odor of raw marijuana remains a factor to be considered in a Fourth Amendment, reasonable suspicion analysis for several reasons.[13] First, the state asserts that the statutory language of the Rhode Island Controlled Substances Act, the Rhode Island Cannabis Act, and the Medical

---

[12] At the time of the stop, the relevant provision relative to the decriminalization of marijuana was contained in G.L. 1956 § 21-28-4.01(c)(2)(iii). This statute was amended in both 2021 and 2022 and the decriminalization language is now found in § 21-28-4.01(c)(2)(iv). This Court will refer to § 21-28-4.01(c)(2)(iii) for purposes of this opinion.

[13] The state limited its argument on this point to the specific issue presented in this case: a law enforcement officer's detection of the odor of fresh or raw marijuana. The state does not discuss the odor of burnt marijuana because this would implicate additional legal provisions and penalties not at issue in this case. *See, e.g.*, G.L. 1956 § 21-28.11-29(a)(3) (criminalizing operating a motor vehicle while under the influence of marijuana). The trial justice also noted in granting defendants' motions to suppress that the court was not distinguishing between fresh and burnt odors of marijuana because the nature of the odor did not change its analysis of reasonable suspicion. Consequently, we similarly limit our discussion related hereto to a law enforcement officer's detection of the odor of fresh or raw marijuana.

Marijuana Act reflects a clear legislative intent that, regardless of changes to marijuana possession for medical or recreational use, "marijuana remain[s] a scheduled narcotic, continues to be classified as contraband and is subject to law enforcement seizure, and no exemptions or absolution exists for those individuals found in possession of marijuana in amounts that exceed the quantities specifically allowed." (Citing § 21-28-5.06; G.L. 1956 § 21-28.6-9(d); §§ 21-28.11-18(b), 11-29(f)(5).) According to the state, the plain language of these acts do not support the assertion that law enforcement officers should be limited in their ability to investigate marijuana offenses or be subject to a heightened reasonable suspicion standard when investigating possible marijuana offenses.

Second, the state points out that many jurisdictions which have addressed the impact that changing marijuana laws has on their Fourth Amendment jurisprudence have held that the odor of marijuana remains a factor to be considered in a totality of the circumstances analysis, regardless of quantity or odor strength. Thus, according to the state, even among states that have passed laws permitting medical or recreational marijuana use, it is generally accepted that the odor of raw marijuana remains a factor to be considered in a reasonable-suspicion analysis.

The state next contends that this Court has never required law enforcement to accurately determine the quantity of a substance before having the ability to investigate the attendant circumstances or take further action. The state argues that

established Fourth Amendment principles "allow an officer who detects an identifiable scent of a scheduled narcotic to diligently pursue a means of investigation that will confirm or dispel their suspicions that criminal activity is afoot." Therefore, the state contends, adopting the position suggested by defendants would create situations where an officer "could not investigate a smell that the officer was specifically trained to recognize as a controlled substance" merely because the officer was unable, through scent, to determine its quantity. This, according to the state, would be "an absurd result that this Court should not condone." In a similar vein, the state avers that the imposition of a quantity requirement would undoubtedly impact the widely prevalent and accepted use of K-9 dogs, who are specifically trained to identify, regardless of quantity, the presence of scheduled narcotics through detection of a scent. Consequently, the state maintains that the smell of raw marijuana remains a factor to be considered in a totality of the circumstances, reasonable suspicion of criminal activity analysis.

Although marijuana remains a controlled substance, and therefore contraband, possession of less than one ounce of marijuana was decriminalized by § 21-28-4.01(c)(2)(iii) of the Rhode Island Controlled Substances Act, which was in effect on the day in question. Specifically, § 21-28-4.01(c)(2)(iii) provides, in pertinent part, that:

> "Notwithstanding any public, special, or general law to the contrary, the possession of one ounce (1 oz.) or less of

marijuana by a person who is eighteen (18) years of age or older, and who is not exempted from penalties pursuant to chapter 28.6 of this title, shall constitute a civil offense, rendering the offender liable to a civil penalty in the amount of one hundred fifty dollars ($150) and forfeiture of the marijuana, but not to any other form of criminal or civil punishment or disqualification." Section 21-28-4.01(c)(2)(iii).

Importantly, the Rhode Island Controlled Substances Act did not alter or otherwise change marijuana's status as contraband because it did not declassify marijuana as a controlled substance, regardless of quantity. *See* § 21-28-2.08(d)(17). Rather, the Rhode Island Controlled Substances Act merely changed the penalties associated with the illegal possession of marijuana and did so only for those individuals found to be in possession of less than one ounce. *See* § 21-28-4.01(c)(2)(iii). So too with the passage of the Medical Marijuana Act, possession of marijuana over the limit permitted thereby would subject the individual to possible arrest and prosecution under the Rhode Island Controlled Substances Act. *See* § 21-28.6-9(d). Indeed, the same holds true for the recently enacted Rhode Island Cannabis Act, which provides, in relevant part, that:

"Notwithstanding any other general or special law to the contrary, except as otherwise provided in this chapter, a person twenty-one (21) years of age or older shall not be arrested, prosecuted, penalized, sanctioned or disqualified under the laws of the state in any manner, or denied any right or privilege and shall not be subject to seizure or forfeiture of assets for:

"(1) Possessing, using, purchasing from a licensed cannabis retailer, or processing one ounce (1 oz.) or less of cannabis, or the equivalent amount in the form of cannabis concentrate[.]" Section 21-28.11-22(a)(1).

The Rhode Island Cannabis Act goes on to explicitly state that, "[*i*]*f a person exceeds the possession limits in violation of law * * * he or she may also be subject to arrest and prosecution under chapter 28 of this title*." *See* § 21-28.11-18(b) (emphasis added). The Rhode Island Cannabis Act also plainly states that "[a]ll cannabis products that are held within the borders of this state in violation of the provisions of chapters 28.6 or 28.11 of this title * * * *are declared to be contraband goods and may be seized by * * * any police or other law enforcement officer in accordance with applicable law * * **." *Id*. § 21-28.11-18(d) (emphasis added) ("All contraband goods seized by the state under this chapter may be destroyed or saved as evidence for the purposes of criminal prosecution.").

The Rhode Island Cannabis Act did not legalize the possession of marijuana full stop. Rather, it permits, among other things, an individual to possess up to one ounce of marijuana for recreational purposes, subject to the limitations set forth therein, as well as in the Rhode Island Controlled Substances Act. *See* § 21-28.11-22(a)(1). We therefore agree with the state that none of these acts support defendants' position that law enforcement officers should be limited in their ability to investigate marijuana offenses, or be subjected to a heightened reasonable-suspicion standard when investigating possible marijuana offenses. The plain

language of these acts reflects the General Assembly's clear intent to criminalize an individual's possession of more than one ounce of marijuana for recreational purposes. *See Mitola v. Providence Public Buildings Authority*, 273 A.3d 618, 626 (R.I. 2022) ("When construing a statute, our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.") (quoting *Generation Realty, LLC v. Catanzaro*, 21 A.3d 253, 259 (R.I. 2011)). Accordingly, we reject defendants' position that law enforcement officers may not rely upon the odor of marijuana, with no other facts indicating quantity, to establish reasonable suspicion. Such a standard would be impracticable to impose on law enforcement officers and their K-9 police dogs, who are specifically trained to identify the presence of scheduled narcotics through scent, regardless of quantity. Thus, for these reasons, it is our opinion that the odor of raw or fresh marijuana, standing alone, remains a factor to be considered in a totality of the circumstances, reasonable suspicion of criminal activity analysis because possession of marijuana by an individual that exceeds the amounts permitted by statute remains a crime subject to arrest and prosecution. *See* § 21-28.11-18(b).

We will now address whether Officer Andreozzi possessed reasonable suspicion to prolong the stop. *See Taveras*, 39 A.3d at 646 ("We review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis.") (quoting *Abdullah*, 730 A.2d at 1076).

We have made clear that "a police officer may conduct an investigatory stop, provided the officer has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity." *Id*. at 647 (brackets omitted) (quoting *Abdullah*, 730 A.2d at 1076). When examining reasonableness, "we consider the totality of the surrounding circumstances." *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017). "No simple, mechanical formula tells us what reasonable suspicion is, though we know that it is less than probable cause and more than a naked hunch." *Id*. (quoting *United States v. McGregor*, 650 F.3d 813, 821 (1st Cir. 2011)).

"We recognize that numerous factors may arise and coalesce to contribute to an officer's finding of reasonable suspicion of criminal conduct." *Taveras*, 39 A.3d at 647. "Although, standing alone, certain factors may not generate the requisite reasonable suspicion, *when viewed in their entirety*[,] these factors may lead to a reasonable and sustainable suspicion of criminal activity." *Id*. (emphasis added). "This confluence of factors has even greater force when it 'involves a pragmatic analysis from the vantage point of a prudent, reasonable police officer in light of the facts known to him or her at the time of the detention.'" *Id*. (brackets omitted) (quoting *State v. Halstead*, 414 A.2d 1138, 1148 (R.I. 1980)). "The court cannot evaluate reasonable suspicion in a vacuum; it must 'make due allowance for the need for police officers to draw upon their experience and arrive at inferences and

- 27 -

deductions that might well elude an untrained person.'" *Orth*, 873 F.3d at 355 (brackets omitted) (quoting *United States v. Arnott*, 758 F.3d 40, 44 (1st Cir. 2014)). "Of course, such deference is not without bounds." *Id*. Thus, "we must assess the presence of reasonable suspicion in a commonsense, case-by-case way, taking in the whole picture" while also giving a "measurable degree of deference to the perceptions of experienced law enforcement officers." *Dion*, 859 F.3d at 124 (internal quotation marks and citations omitted).

Applying these principles to the instant case, we believe that the trial justice's reasonable-suspicion analysis was flawed in two respects. First, as noted by the state, the trial justice improperly engaged in a "divide-and-conquer" reasonable-suspicion analysis in granting defendants' motions to suppress, which was expressly rejected by the Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002). Rather than conducting a totality of the circumstances analysis, the trial justice instead individually considered each circumstance that Officer Andreozzi relied upon to develop reasonable suspicion. *See id*. at 273 (holding that a court making a reasonable suspicion determination "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing") (quoting *Cortez*, 449 U.S. at 417-18). For example, the trial justice first addressed nervousness and explained that nervousness was of slight use in the reasonable-suspicion analysis because it "is a common and

entirely natural reaction to police presence." (Quoting *McKoy*, 428 F.3d at 40.) Consequently, the trial justice essentially disregarded nervousness as a factor to be considered in determining whether Officer Andreozzi developed reasonable suspicion to prolong the stop. The trial justice similarly gave little to no weight to the fact that defendants were traveling on a highway considered by law enforcement to be part of a drug trafficking corridor because it would be "unreasonable to infer that a person is a drug trafficker simply from a use of the highway * * *."

Second, despite acknowledging that our caselaw requires the court to give deference to the perceptions of experienced law enforcement officers, the trial justice gave little to no weight to Officer Andreozzi's law enforcement training and experience. Instead, the trial justice found much of Officer Andreozzi's testimony unpersuasive, despite his extensive background and experience. The trial justice then proceeded to engage in a sort of *post hoc* analysis by questioning, with the benefit of hindsight, some of Officer Andreozzi's actions or inactions during the encounter. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("[W]e have cautioned that courts should not indulge in 'unrealistic second-guessing,' * * * and we have noted that 'creative judges, engaged in *post hoc* evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.'") (brackets omitted) (quoting *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985)); *Collodo*,

661 A.2d at 66 ("[O]bservations and the totality of circumstances 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'") (quoting *Cortez*, 449 U.S. at 418).

We have been clear that nervousness exhibited by a person stopped by law enforcement is a factor to be considered in a reasonable-suspicion analysis. *See State v. Guzman*, 752 A.2d 1, 4 (R.I. 2000) ("Although a suspect's apparent nervousness alone cannot elevate reasonable suspicion to the level of probable cause, a police officer may consider the suspect's demeanor upon encountering the police, including any observed nervousness, as one factor within the officer's probable-cause calculus."). Moreover, "[t]he personal knowledge and experience of the officers are important factors that may allow an officer reasonably to infer from observation of otherwise innocuous conduct that criminal activity is imminent or is taking place." *Halstead*, 414 A.2d at 1148-49. To this end, we have made clear that "[i]n making a determination of reasonable suspicion[,] the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attached to particular types of noncriminal acts." *Abdullah*, 730 A.2d at 1077 (quoting *Sokolow*, 490 U.S. at 10).

Here, Officer Andreozzi testified during the suppression hearing that, within minutes of the initial stop, he observed defendants' abnormal and increasingly nervous behavior. Specifically, Officer Andreozzi testified that Li grew

"increasingly nervous" and that he could visibly see Li's chest pounding and sweat beginning to appear on his forehead and just above his eyebrows. Interestingly, according to Officer Andreozzi, Li was "fine" when he made the initial approach to the vehicle but, soon thereafter, Officer Andreozzi could see Li's increasing nervousness. Officer Andreozzi testified that, in his experience, Li's nervousness "was above where someone is nervous because they were stopped for the passenger * * * not wearing a seatbelt." Officer Andreozzi also testified that Kuang became increasingly nervous and that he could recall observing Kuang's chest pound as well. It was soon after observing defendants' abnormal nervousness that Officer Andreozzi also noticed the slight odor of marijuana emanating from the vehicle. These observations were coupled with defendants having stated that they were traveling from New York to Boston to visit a friend for only a couple of hours, and would be traveling back to New York the same day. Finally, Officer Andreozzi testified that the vehicle had New York plates and that the route where defendants were pulled over had a "[v]ery common" history of narcotic trafficking.

Considering the situation as a whole, and affording Officer Andreozzi's decade-plus of law enforcement experience due deference, we are satisfied that the facts and circumstances identified above were sufficiently specific and articulable for Officer Andreozzi to have developed reasonable suspicion that criminal activity

was afoot, justifying the prolongation of the stop.[14] *See Halstead*, 414 A.2d at 1148 ("[R]easonable suspicion, like probable cause, is not an abstract principle to be considered in a vacuum; it involves a pragmatic analysis from the vantage point of a prudent, reasonable police officer in light of the facts known to him at the time of the detention."). While we acknowledge that defendants' nervousness and their route of travel on a public highway were not strong indicators of criminal activity in and of themselves, when considering the totality of the circumstances from the vantage point of an experienced police officer, defendants' abnormal nervousness and route of travel of short duration, coupled with the odor of marijuana, could very well create a reasonable suspicion that the defendants were engaged in some sort of criminal activity. Additionally, we believe that Officer Andreozzi's conduct was reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gathered during the stop, and that Officer Andreozzi diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly. *See State v. Casas*, 900 A.2d 1120, 1133 (R.I. 2006).

Consequently, we hold that the trial justice erred in concluding that Officer Andreozzi did not possess reasonable suspicion to prolong the stop based on the

---

[14] Because we have determined that reasonable suspicion existed at the time defendants were lawfully removed from the vehicle, we need go no further in discussing the events that occurred after Li was seated inside the police cruiser.

totality of the circumstances and, therefore, erred in granting defendants' motions to suppress evidence of marijuana seized from Kuang's vehicle.

## Conclusion

For the foregoing reasons, we vacate the orders of the Superior Court and remand these matters for further proceedings. The record in this matter shall be returned to the Superior Court with our opinion endorsed thereon.

**Justice Long, dissenting.** The majority vacates the trial justice's orders granting Mr. Li and Mr. Kuang's motions to suppress and holds that Officer Andreozzi possessed reasonable suspicion sufficient to prolong the traffic-violation stop. I disagree. It is my view that the trial justice did not clearly err in determining that Officer Andreozzi prolonged the traffic stop without reasonable suspicion that Mr. Li and Mr. Kuang were engaged in criminal activity, and, further, that he did not clearly err in granting their motions to suppress the evidence found in their vehicle. Therefore, I respectfully dissent.

This Court reviews a trial justice's findings of historical fact contained in her or his decision on a motion to suppress for clear error. *State v. Guzman*, 752 A.2d 1, 3 (R.I. 2000). However, we review a trial justice's determination of the presence or absence of reasonable suspicion *de novo*. *State v. Abdullah*, 730 A.2d 1074, 1076 (R.I. 1999).

It is indisputable that a police officer's effectuation of a traffic stop results in a seizure of the driver and all occupants of the vehicle pursuant to the Fourth Amendment. *State v. Parra*, 941 A.2d 799, 803-04 (R.I. 2007). While the Fourth Amendment plainly permits seizures in certain instances, those seizures must be reasonable. *Id.* Further, courts assess the constitutionality of a traffic stop and the existence of reasonable suspicion by evaluating the totality of the circumstances. *State v. Foster*, 842 A.2d 1047, 1050-51 (R.I. 2004). This Court has also held that the Fourth Amendment permits a police officer to order individuals out of an otherwise lawfully stopped vehicle. *Parra*, 941 A.2d at 804. However, once a police officer accomplishes the purpose of the traffic stop, the officer may not inhibit an individual and engage in an otherwise open-ended campaign for contraband in anticipation of discovering additional evidence of criminal wrongdoing. *Id*.

Regarding the duration of a traffic stop, a police officer is permitted to seize an individual for as long as is needed to address the reason for the traffic stop and to manage any related safety issues. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "On-scene investigation into other crimes, however, detours from that mission. * * * So too do safety precautions taken in order to facilitate such detours." *Id*. at 356.

Of course, once an officer makes a lawful traffic stop, the officer may reasonably respond to circumstances that unfold during the stop. *United States v.*

*Sowers*, 136 F.3d 24, 27 (1st Cir. 1998); *see also United States v. Orth*, 873 F.3d 349, 354 (1st Cir. 2017) (noting that events unfolding during a traffic stop permit officers to shift their focus and expand the investigation by degrees as they accumulate new information). To assess the reasonableness of an officer's response to the unfolding circumstances of a given case, trial justices must evaluate the totality of circumstances and balance the nature and quality of that intrusion on an individual's personal security against the significance of the government's interest offered to justify that further intrusion. *Sowers*, 136 F.3d at 27.

Applying these principles to the facts of this matter, I believe that the trial justice appropriately began his analysis by considering whether Officer Andreozzi's action in escalating the initial seizure of Mr. Li—by detaining Mr. Li in his cruiser—was reasonably responsive to the lawful traffic stop for a seat-belt violation. The trial justice correctly assessed the totality of the circumstances and balanced the nature and quality of the intrusion on Mr. Li's personal security against the importance of the governmental interests alleged to have justified the intrusion. *See Sowers*, 136 F.3d at 27. After undertaking this analysis, the trial justice supportably found that Officer Andreozzi impermissibly escalated his seizure of Mr. Li and that

his subsequent actions did not reasonably respond to events that unfolded following the traffic stop.[1]

_____

[1] I concede that the analysis of the reasonableness of Officer Andreozzi's response to the unfolding circumstances would be different if Officer Andreozzi had simply asked Mr. Li to step out of the vehicle. However, the undisputed historical fact found by the trial justice was that "[a]fter obtaining the vehicle registration as well as Li and Kuang's licenses, Andreozzi requested Li to exit the vehicle and directed him to sit in the front passenger seat of his cruiser while he performed law enforcement checks." Officer Andreozzi's testimony, on both direct and cross-examination, supports this finding:

> "[OFFICER ANDREOZZI]: I asked Mr. Li to exit his car, come sit with me in my cruiser while I conducted and checked on the vehicle registration and both of the occupants' licenses.
>
> "[PROSECUTOR]: What was the purpose of that?
>
> "[OFFICER ANDREOZZI]: It is multifaceted. One for officer safety. It is more safe for me to have him out of his vehicle and in mine.
> No. 2, if I'm suspecting some type of criminal activity is afoot, I like the two occupants to be separated so they don't know the responses of each party.
> And No. 3, if I'm conducting law enforcement checks while I can speak to the operator, I'm not prolonging anything. I can accomplish more by doing that."
>
> * * *
>
> "[DEFENSE COUNSEL]: You felt unsafe at the moment you took the driver out of his driver seat?
>
> "[OFFICER ANDREOZZI]: I wouldn't use that adjective but it was uncomfortable.

Examination of the record and decision reveals that, after Officer Andreozzi approached the passenger-side window of the vehicle, he spoke with Mr. Li, collected the vehicle registration, proof of insurance, and occupant driver's licenses, and noticed "a slight odor of fresh marijuana" as well as Mr. Li and Mr. Kuang's nervousness. Officer Andreozzi directed Mr. Li to sit in the front seat of his police cruiser because, he testified, "[i]t is more safe for me to have him out of his vehicle and in mine." However, the trial justice discredited Officer Andreozzi's testimony in this regard and was not persuaded that safety concerns motivated the escalated level of detention. The trial justice noted that Officer Andreozzi testified that he felt uncomfortable rather than unsafe; and the trial justice further inferred that Officer Andreozzi did not behave like someone motivated by safety concerns: He directed

---

"[DEFENSE COUNSEL]: You placed him in the passenger seat?

"[OFFICER ANDREOZZI]: Yes.

"[DEFENSE COUNSEL]: Was he free to leave your passenger seat if he wanted to?

"[OFFICER ANDREOZZI]: No."

This Court conducts "an independent examination of the record to determine if [the defendant's] rights have been violated." *State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006) (quoting *State v. Abdullah*, 730 A.2d 1074, 1077 (R.I. 1999)). Thus, my analysis of the reasonableness of Officer Andreozzi's response to the unfolding circumstances accounts for the fact that Officer Andreozzi detained Mr. Li in his police cruiser.

Mr. Li to sit in the front seat of his cruiser *without* patting Mr. Li for weapons and *without* having first checked his criminal history. The trial justice also did not find persuasive Officer Andreozzi's additional justifications for placing Mr. Li in the cruiser. It was within the discretion of the trial justice, as the factfinder, to weigh Officer Andreozzi's testimony and not to be persuaded by it. Accordingly, after analyzing the totality of circumstances and conducting the appropriate balancing test, the trial justice supportably found that Officer Andreozzi detained Mr. Li in the cruiser—from which Mr. Li was not free to leave—as an impermissible safety precaution taken to facilitate a detour from the mission of the traffic stop.

Having determined that Officer Andreozzi deviated from the mission of the traffic stop, the trial justice appropriately turned to considering whether Officer Andreozzi otherwise had a particularized and objective basis to justify prolonging the traffic stop. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981) ("But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."). The trial justice correctly reviewed the testimony concerning events leading up to that point and found that, during the six minutes leading up to Mr. Li's detention in the police cruiser, Mr. Li and Mr. Kuang complied with Officer Andreozzi's requests; lacked any signs of aggressive

behavior; and failed to make furtive gestures or act evasively.  Officer Andreozzi therefore relied on three articulable facts, based on his observations and patterns of behavior by drug traffickers, to justify prolonging the traffic stop: (1) Mr. Li and Mr. Kuang's nervous behavior; (2) Mr. Li and Mr. Kuang's decision to travel on a public highway that reputedly constitutes a "drug trafficking corridor"; and (3) the slight odor of marijuana.

In my view, the trial justice correctly concluded that the whole picture presented by these three factors alone did not provide a sufficient basis to suspect that Mr. Li and Mr. Kuang were engaged in drug trafficking, thus reasonably permitting Officer Andreozzi to prolong the traffic stop.[2]

---

[2] The state asserts and the majority concludes that, rather than engaging in a totality of circumstances analysis, the trial justice considered each factor in his reasonable-suspicion analysis individually and that the United States Supreme Court prohibited this analytical method in *United States v. Arvizu*, 534 U.S. 266 (2002). While I agree that the Supreme Court rejected a divide-and-conquer approach to evaluating the totality of circumstances in a reasonable suspicion analysis, the Court's holding is clearly specific to the methodology applied by *appellate* courts rather than addressing the way that trial courts perform their fact-finding role. *Id*. at 274, 276-77.  Appellate courts review reasonable suspicion and probable-cause determinations *de novo*, but appellate courts also "review findings of historical fact only for clear error and * * * give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *Casas*, 900 A.2d at 1129.

A trial justice does not function as a rubber stamp but assesses the state's evidence and carefully considers whether the state has met its burden of proof. *See State v. Tavarez*, 572 A.2d 276, 279 (R.I. 1990).  It is true that, when making findings of fact about the events leading up to a stop or search in a particular case, trial justices evaluate and weigh the inferences and deductions drawn by trained police officers. *United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[T]he evidence thus collected

With respect to the first factor, defendants' nervous behavior, it is accepted that nervousness can be considered as part of a reasonable-suspicion analysis. *Guzman*, 752 A.2d at 4. Officer Andreozzi testified that he was trained to look for signs of nervousness and did observe nervousness in Mr. Li and Mr. Kuang. The trial justice credited this observation but gave it minimal weight when viewing the totality of the circumstances, particularly as Officer Andreozzi conceded that virtually all individuals become nervous when stopped by the police. Based on this testimony, the trial justice was not clearly wrong to discount the significance of Mr. Li and Mr. Kuang's nervous behavior.

With respect to Mr. Li and Mr. Kuang's decision to travel on I-95, it is accepted that location can also be considered as part of a reasonable-suspicion analysis. *State v. Ditren*, 126 A.3d 414, 420 (R.I. 2015). Officer Andreozzi testified that, from his experience, he knows that there are large amounts of narcotics on I-95. This Court will "give due weight to inferences drawn from those facts by resident

---

must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."). However, trial justices are not required to accept an officer's testimony or inferences unquestioningly, nor are they required to be entirely persuaded by it. *See, e.g., United States v. Pavao*, No. 1:22-CR-00034-MSM-PAS, 2023 WL 3934555, at *1 (D.R.I. June 9, 2023). Moreover, when two permissible views of evidence exist, a trial justice's choice between either view cannot constitute clear error. *See Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574 (1985). Accordingly, a trial justice who is not fully persuaded by a police officer's testimony, or who perceives contradictions in that testimony, does not clearly err by assigning less than full weight to that testimony.

- 40 -

judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Nevertheless, it is not clearly erroneous to assign little weight to an inference that someone from out of state traveling on I-95 might be a drug trafficker. *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (concluding that an agent of the Drug Enforcement Administration could not reasonably suspect criminal activity where "circumstances describe a very large category of presumably innocent travelers"); *see also United States v. Jerez*, 108 F.3d 684, 694 (7th Cir. 1997) (finding no reasonable suspicion when multiple "articulated characteristics could be ascribed generally to innocent travelers"). Accordingly, I cannot conclude that the trial justice erred in assigning only minimal weight to the inference drawn from the fact that Mr. Li and Mr. Kuang were traveling on I-95.

Finally, with respect to the slight odor of marijuana, it is undisputed that, at the time this traffic stop occurred, it was no longer criminal (1) for adults in Rhode Island to possess one ounce or less of marijuana, *see* § 21-28-4.01(c)(2)(iii), as amended by P.L. 2012, ch. 221, § 1 and P.L. 2012, ch. 233 § 1; or (2) for a person with a valid medical marijuana prescription to possess marijuana in Rhode Island. *See* § 21-28-4.01(c)(1). Officer Andreozzi testified that he was trained to detect the odor of fresh marijuana and that he detected a slight, but not strong, odor of marijuana after he stopped Mr. Li and Mr. Kuang and approached the vehicle. He

also testified that he was seeing more marijuana usage in motor vehicles since decriminalization.

The defendants argued, and the trial justice agreed, that the slight odor of marijuana, without further investigation or questioning, did not provide Officer Andreozzi with reasonable suspicion that the vehicle contained a criminal amount of marijuana. I cannot say that the trial justice erred in drawing this conclusion. Based on the tableau that began to emerge as Officer Andreozzi spoke to Mr. Li immediately following the traffic stop, it was reasonable for his focus to shift when he detected the slight odor of marijuana. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). However, because possession by an adult of one ounce or less of marijuana is not criminal, and because it is no longer criminal for a person with a valid medical marijuana prescription to possess marijuana, I agree with the trial justice that our Fourth Amendment jurisprudence required Officer Andreozzi to "increase the scope of his investigation by degrees" before calling for a sniffer dog, thereby prolonging the traffic stop. *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008) (quoting *Chhien*, 266 F.3d at 6). Moreover, like the trial justice, I also acknowledge the prevalence of legal marijuana in contemporary society and agree that, when viewed together under the totality of circumstances, the three factors

articulated by Officer Andreozzi did not constitute reasonable suspicion sufficient to prolong the traffic stop.[3]

After my independent examination of the record, I cannot conclude that the trial justice was clearly wrong in determining that Officer Andreozzi lacked reasonable suspicion of criminal wrongdoing at the time he placed Mr. Li in the

---

[3] Considering the recent legislative developments legalizing recreational marijuana in Rhode Island, I respectfully but unequivocally disagree with the decision to allow law enforcement officers to presume that an individual possesses an *illegal* quantity of an otherwise *legal* substance. *Cf. United States v. Jones*, 606 F.3d 964, 968 (8th Cir. 2010) (Loken, C.J., concurring) ("But the question here is whether anyone reasonably *suspected* of having a firearm in his or her pocket or purse may be forcibly stopped and searched when the police have no particularized reason to suspect that the person is *unlawfully* carrying a weapon.").

I also note that, given the evolving landscape with respect to the legalization of marijuana, it is clear that courts across the United States are struggling to articulate an appropriate approach to considering the implications of the odor of marijuana and analyses of reasonable suspicion and probable cause. *See State v. Nagel*, 232 A.3d 1081, 1087 (Vt. 2020) (holding that police officers *lacked* reasonable suspicion to justify a search of a motor vehicle after smelling the odor of marijuana); *Commonwealth v. Daniel*, 985 N.E.2d 843, 848-49 (Mass. 2013) (holding that the police lacked probable cause to search a defendant's vehicle for marijuana after an officer smelled the odor of marijuana and found two small bags of marijuana on the defendant's person); *Commonwealth v. Barr*, 266 A.3d 25, 41 (Pa. 2021) (holding that police officers lacked probable cause to search a vehicle based solely on the odor of marijuana). *But cf. State v. Tibbles*, 236 P.3d 885, 888 (Wash. 2010) (holding that police officers lacked exigent circumstances sufficient to justify warrantless search of a defendant's vehicle, despite the fact that they smelled the odor of marijuana, which created probable cause); *People v. Zuniga*, 372 P.3d 1052, 1059 (Colo. 2016) (holding that police officers may consider the odor of marijuana in analyzing whether probable cause exists, *despite* its legality under state law). Based on the presumption that law enforcement officers know and understand the current state of the law in a given jurisdiction, police officers must also employ a contemporary approach when considering, and responding to, the odor of marijuana as it arises during a traffic stop.

police cruiser and thereby prolonged the traffic stop. Accordingly, I respectfully dissent.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Junjie Li.<br>State v. Zhong Kuang. |
| **Case Number** | No. 2021-153-C.A. (K2/19-513A)<br>No. 2021-154-C.A. (K2/19-513B) |
| **Date Opinion Filed** | July 27, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Mariana Ormonde<br>Department of Attorney General |
| | For Defendant<br><br>John L. Calcagni, III, Esq. |

SU-CMS-02A (revised November 2022)